Date signed March 05, 2007



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANK**
**FOR THE DISTRICT OF MARYLAND**
**at GREENBELT**

|  |  |  |
|---|---|---|
| In re: | * | |
| The Pleasantview Swimming Pool | * | |
| Association, Inc. | * | |
| | * | Case No.   06-16871-TJC |
| | * | |
| | * | |
| (Debtor) | * | (Chapter 11) |
| | * | |
| | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ORDER GRANTING MOTION TO APPROVE SALE OF REAL PROPERTY AND MAKE ADEQUATE PROTECTION PAYMENT

Before the Court is the Motion to Approve Sale of Real Property and to Make Adequate Protection Payment (the "Sale Motion") filed by The Pleasantview Swimming Pool Association, Inc. (the "Debtor").  Docket No. 40.  In the Sale Motion, the Debtor seeks authority to sell its swimming pool and commercial real estate at 3801 Wexford Boulevard, Kensington, Maryland (the "Property") and to make an interim adequate protection payment to SOP Joint Venture ("SOP").  SOP, which holds a loan secured by a deed of trust against the Property, opposes the Sale Motion.  The Court held a hearing on the Sale Motion on February 22, 2007.  At the conclusion of the hearing the Court issued a ruling from the bench announcing it would approve the sale.

On a number of occasions throughout the hearing and in the bench ruling, the Court noted the change in position of SOP in connection with the Sale Motion, when compared to the position SOP asserted in prosecuting its Motion for an Order Granting Relief from Automatic Stay (the "Stay Relief Motion") in November 2006 through January 2007. The Court addressed that change of position in issuing the bench ruling, although it did not specifically address whether SOP was judicially estopped to make the new factual assertions it made at the hearing. The Court issues this supplement to address the issue of judicial estoppel in the context of SOP's change in position. Accordingly, this decision supplements the bench ruling issued on February 22, 2007.

## SUPPLEMENTAL FINDINGS OF FACT

The Debtor is a not-for-profit association that operates a neighborhood swimming pool and other facilities at the Property. It filed a petition under Chapter 11 on October 31, 2006. The immediate impetus for the filing of the petition was that SOP had scheduled a foreclosure sale of the Property due to the Debtor's default on the SOP loan.

On November 14, 2006, SOP filed the Stay Relief Motion seeking an order from the Court allowing it to go forward with a foreclosure sale. The Court held a preliminary hearing on the Stay Relief Motion on December 12, 2006 and a final hearing on January 10, 2007. At the time of the hearings, all parties agreed that the Debtor's economic circumstances did not allow it to continue as a going concern as a swimming pool association, and therefore the Debtor was required to sell the Property. Further, there was no dispute that the value of the Property was substantially in excess of the claims against the Debtor. In addition, both the Debtor and SOP agreed that, because the Debtor was a nonprofit association that had no equity members, any surplus from the sale of the

2

Property must be contributed to a nonprofit entity rather than distributed to equity members, as would be the case in a for-profit corporation.

The Debtor argued that SOP, whose total debt was no more than approximately $320,000 or so, was more than adequately protected by the value of the Property, and would certainly be paid in full upon the sale of the Property for all allowed amounts that would become due to SOP. The Debtor also argued that the total known claims against the estate were approximately $400,000 (including SOP) and all creditors would be paid in full from a sale.[1] The Debtor argued that the Stay Relief Motion should be denied and the Debtor should be allowed to pursue an orderly sale of the Property.

In connection with the Stay Relief Motion, SOP made the following factual assertions:

(1) The Debtor was a nonprofit association that had no equity members.

(2) Assuming the value of the Property was $1 million, the Court should allow the foreclosure sale to go forward because even if the Property sold for 75 percent of that amount at a foreclosure sale, that amount would be more than sufficient to pay all creditors in this case. Specifically, SOP argued that "there is so much" equity in the Property that the loss in value between a foreclosure sale and an orderly sale would cause no real economic harm to anyone.

(3) The two individual members of SOP, which is a joint venture, were themselves members of the Debtor. The Debtor's obligations to SOP arose when SOP made a loan to the Debtor in July, 2003, to allow it to pay off a

---

[1] The total claims scheduled by the Debtor in the case are $401,148.52, including SOP's claim which was scheduled as disputed in the amount of $309,986. As of March 1, 2007, the total claims filed are less than $430,000, including SOP's filed proof of claim in the amount of $320,846. The bar date for filing claims was February 25, 2007. At the Sale Motion hearing, the Debtor proffered that on a "worst case basis" it believed the total claims could not exceed $600,000.

prior deed of trust loan that was in default. SOP's loan to the Debtor allowed the Debtor to avoid a foreclosure sale of the Property. In making the loan to the Debtor, the members of SOP had borrowed against their homes or otherwise financially extended themselves personally, such that the current default and failure by the Debtor to pay SOP's loan was causing them severe financial hardship. SOP alleged that the financial strain on the members of SOP was so substantial as to result potentially in the need for one or both of them to file a personal bankruptcy case. SOP argued strenuously that the Court should take the financial plight of the individual members of SOP into account in allowing SOP to foreclose immediately on the Property.

The Court denied the Stay Relief Motion. However, the Court ruled that it would take into consideration the personal financial plight of the members of SOP that resulted from the Debtor's default on the SOP loan, notwithstanding the apparent substantial equity cushion in the Property. The Court fashioned relief specifically designed to provide the individual members of SOP with some relief. First, at the hearing on December 12, 2006, the Court required the Debtor to accelerate its efforts to retain a real estate agent on an expedited basis, and required that SOP file any objection to the application to retain the agent within three days so that the Debtor could begin immediately to market the Property. Second, the Court made it clear to the Debtor that it would require the Debtor to sell the Property on an expedited basis. The Court set a status hearing for 60 days after the conclusion of the January 10, 2007, final hearing on the Stay Relief Motion, and made it clear that it anticipated that the Debtor should have a sale contract by that date. Third, the Court required that the Debtor must take into account the

financial plight of the individual members of SOP during the marketing period, by
attempting to obtain interim financing or otherwise finding a way to provide interim
payments to SOP during the marketing process.[2]

The Debtor responded with remarkable success.  Within 41 days of the conclusion
of the Stay Relief Motion, the Debtor obtained a contract for the sale of the Property.
The proposed contract (1) is for a sale price of $1 million; (2) is unconditional, other than
the need for Court approval; (3) is "as is, where is"; and (4) perhaps most significantly,
allows the $50,000 deposit to be paid immediately upon Court approval to SOP as an
adequate protection payment.  This last provision is a unique provision in a bankruptcy
sale contract and was obtained by the Debtor strictly to alleviate SOP's financial
hardship.

The Debtor filed the Sale Motion on an emergency basis and requested an
immediate hearing on two days notice.  The Debtor reasoned that, since all creditors are
being paid in full, and considering SOP's stated financial plight, the sooner the contract
was approved, the sooner SOP could receive the $50,000 adequate protection payment.
The Court granted the emergency motion to shorten the notice period required for the
Sale Motion and held a hearing on February 22, 2007.  Again, the Court did so because
(1) all other creditors are being paid in full; and (2) SOP had urged the Court to require
that the sale be made on an expedited basis to alleviate the financial strain on its
members.

At the sale hearing, the Debtor proffered that the proposed contract was the
highest and best of nine offers it received.[3]  It further proffered that the Debtor's board of

---

[2] For example, the Court ordered that any net income of the Debtor must be paid to SOP each month.
However, the Debtor has had no net income that could be used to make interim payments to SOP since the
Stay Relief Motion was filed.

directors believed the offer was the best offer available because of its price and lack of a study period contingency. The Debtor stated that it specifically required the provision allowing the payment of the $50,000 deposit to SOP as a response to SOP's financial plight.

In this regard, approval of the sale was fairly straightforward under 11 U.S.C. § 363(b), since the proffered testimony readily established that the sale was in the best interest of the estate. Moreover, specifically with respect to SOP's objection, approval of the sale was straightforward under 11 U.S.C. § 363(f), because the price at which the Property is to be sold is greater than the aggregate value of all liens on the Property.

At the hearing, however, SOP presented a stunning turnaround in its factual position as compared to the assertions it made at the hearings on the Stay Relief Motion. SOP stated that (1) a sale price of $1 million may not be enough to pay all creditors in full; (2) the Debtor should give notice of the sale to all current and former members of the Debtor because the current and prior members should have a say in who purchases the Property and may have claims against the Debtor; and (3) SOP should be allowed to conduct litigation over whether the Debtor's board of directors is properly constituted.

SOP's justification for this turnaround is that, in connection with the Stay Relief Motion, SOP was arguing in its capacity as a secured creditor of the Debtor. However, with respect to the Sale Motion, the individual members of SOP, who, as mentioned above, also are members of the Debtor, were asserting rights in their capacities as

---

[3] The President of the Debtor was in court for the hearing and available to testify, as were representatives of SOP. Both the Debtor and SOP proffered the factual basis for the relief each requested. At the conclusion of argument but before ruling, the Court took a short break and asked the parties to identify after the break those factual issues that were in dispute and that required testimony and a factual adjudication. The only issue raised by either party was SOP's contention that the Court should decide whether the board is properly constituted, which will be addressed herein. The Debtor contended that the Court need not resolve that issue to approve the Sale Motion.

members of the Debtor (rather than as members of SOP as a creditor).  The Debtor

asserts that the real reason for SOP's turnaround is that the Debtor has decided it may

challenge a portion of SOP's claim, and SOP wants time to seek an election of a new

"friendly" board that would not challenge SOP's claim.

## CONCLUSIONS OF LAW

Judicial estoppel is an equitable doctrine that "exists to prevent litigants from

playing fast and loose with the courts – to deter improper manipulation of the judiciary."

Folio v. City of Clarksburg, W.Va., 134 F.3d 1211, 1217 (4th Cir. 1988) (quotation

omitted).

> In order for judicial estoppel to apply, (1) the party to be estopped
> must be advancing an assertion that is inconsistent with a position
> taken during previous litigation; (2) the position must be one of fact,
> rather than law or legal theory; (3) the prior position must have been
> accepted by the court in the first proceeding; and (4) the party to be
> estopped must have acted intentionally, not inadvertently.

Calafiore v. Werner Enterprises, Inc., 418 F.Supp. 2d 795, 797  (D. MD. 2006).

Although the elements of judicial estoppel require that the party being estopped acted

intentionally, application of the doctrine does not require that the party "consciously

engaged in chicanery."  Id. at 799.

Applying the foregoing principles to the facts herein, the Court concludes that,

insofar as the Sale Motion is concerned, SOP is judicially estopped to argue that (1) the

$1 million is an insufficient price to obtain for the Property; and (2) the Debtor's board

does not have the authority to authorize the sale of the Property.

The Sale Price and the Need for the Immediate Sale.  As stated in the

Supplemental Findings of Fact, supra at p. 3, SOP argued repeatedly during the stay relief

proceedings that a foreclosure sale of 75 percent of the Property's value would be more

than sufficient to pay all claims.  Both SOP and the Debtor agreed that any surplus from the sale of the Property after paying all claims against the Debtor would be contributed to a non-profit entity.  Accordingly, SOP argued that no one would be harmed by the loss of value that would result from a foreclosure sale – the only negative effect from a foreclosure sale would be that a lesser amount of funds would be contributed to a charitable entity.  In addition, as also stated in the Findings of Fact, SOP argued strenuously that it needed an immediate sale of the Property to prevent its members from experiencing severe personal financial hardship, including potential personal bankruptcy proceedings.  Id. at p 3-4.

These assertions were factual in nature and are inconsistent with the factual assertions made by SOP at the Sale Motion hearing.  These factual allegations were made intentionally by SOP in an effort to convince the Court to allow it to foreclose immediately on the Property.

Further, the Court accepted these factual assertions in the prior Stay Relief litigation[4] by requiring the Debtor to take the actions described above, including marketing the Property on an expedited basis and addressing SOP's financial plight in the sale process.  See supra at p. 4-5.  Accordingly, the Court finds and concludes that SOP is judicially estopped to argue that $1 million is an insufficient sale price to obtain for the Property or that the Property should not be sold immediately.

Delay the Sale to Litigate Whether the Board is Improperly Constituted.  At the Sale Motion hearing, SOP argued that the Debtor's board is improperly constituted and therefore cannot approve the sale contract.  It requested that the Court defer ruling on the

---

[4] The filing of a motion for relief from the automatic stay initiated a separate contested matter.  See Fed. R. Bank. P. 4001 and 9014.

Sale Motion to allow it to conduct litigation over whether the board is properly constituted.

This position is factually inconsistent with the position taken by SOP in the Stay Relief Motion.  First, SOP wanted an immediate foreclosure sale of the Property, which would have required no board approval and would not have been delayed over corporate governance disputes.  Second, in arguing that it should be allowed to conduct a foreclosure sale of the Property, SOP implicitly contended that no members of the Debtor would (or should) have any say in who purchased the Property, since it would be sold at foreclosure to the highest bidder.

To be sure, at the preliminary hearing on the Stay Relief Motion, as an alternative to seeking an order allowing it to foreclose, SOP argued that the bankruptcy case should be dismissed because the board was not properly constituted.  Although the individual members of the board unanimously signed a resolution authorizing the filing of the petition, SOP contended that the board acted in bad faith and had not been properly elected.   While SOP raised these arguments at the December 12, 2006, hearing, it had not raised these issues in the filings made with respect to the Stay Relief Motion and the Debtor did not have notice of these contentions prior to that hearing.  One of the express reasons the Court held off ruling at the preliminary hearing on the Stay Relief Motion and set the matter for a final hearing in January 2007, was to enable SOP to file a motion to dismiss the bankruptcy case as not being properly authorized and filed in bad faith.  The Court stated that the motion to dismiss would be heard at the same time as the final hearing on the Stay Relief Motion on January 10, 2007.

SOP chose not to file such a motion before the final hearing on January 10, 2007. Nor did SOP file a motion to dismiss after the Court made it clear at the final hearing on the Stay Relief Motion that the Debtor must sell the Property on an expedited basis. Undoubtedly, at that point, SOP, although disappointed with not achieving the right to foreclose, was satisfied that the Property nevertheless would be sold quickly.  Having (1) implored the Court to move this case (and in particular, the sale of the Property) on an expedited basis; and (2) failed to file the motion to dismiss after being given a specific opportunity to do so, SOP cannot now revive this issue out of an apparent concern that the Debtor's board will authorize a challenge to SOP's claim.

In sum, the Court is convinced that the proposed contract is in the best interest of the estate and should be approved.  The Court understands that SOP is frustrated in that, after SOP stepped forward to bail the Debtor out of its financial problems by making the loan in 2003, SOP believes it has been treated unfairly by the Debtor.  The Court also recognizes there may be strained relations between SOP and some or all members of the board.  The Court, however, is further convinced that the best course of action is to allow the Debtor to execute the contract for the sale of the Property, pay immediately $50,000 to SOP as an adequate protection payment, and allow the Debtor to consummate the sale of the Property.  The interim payment of $50,000 will alleviate the financial strain on the members of SOP as they have previously asserted.  At the closing of the sale of the Property, the Debtor shall pay SOP all undisputed amounts owed, which includes the principal balance of $180,000 and any undisputed interest or other charges, after taking into account the $50,000 payment. Whether the Debtor challenges any portion of the SOP

10

claim will be left for another day. But if the claim is challenged, the Court can sort out

whether it is a bona fide objection or brought in bad faith.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the ruling from the bench

on February 22, 2007, the Court will approve the Sale Motion. The Court will enter an

appropriate order.

.

Copies To:

Debtor
Debtor's Attorney- Brett Weiss, James Hoffman
SOP Joint Venture- Stephen Carper
Office of the U.S. Trustee
All Creditors on the Mailing Matrix

## END OF ORDER